UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

BENITA MERENDO,

                Plaintiff,

    v.

OHIO GASTROENTEROLOGY
GROUP, INC.,

                Defendant.

Case No. 2:17-cv-817
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Kimberly A. Jolson

## OPINION AND ORDER

This matter is before the Court on Defendant Ohio Gastroenterology Group, Inc.'s

("Defendant") Motion for Summary Judgment (ECF No. 12), Plaintiff Benita Merendo's

("Plaintiff") Memorandum in Opposition (ECF No. 15), and Defendant's Reply (ECF No. 17).

For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's

Motion for Summary Judgment. (ECF No. 12).

I.

### A. Factual Background

In June 2011, Plaintiff began working as a full-time Billing Representative for Defendant.

(Pl.'s Aff. ¶ 4, ECF No. 15-2). Plaintiff's primary job functions included: communicating with

patients; entering patient demographic, insurance, and medical information into Defendant's

computer system; contacting insurance companies; verifying insurance eligibility; and answering

phone calls. (Pl.'s Exhibit A, ECF No. 15-3).

Because Plaintiff could access and view confidential patient medical information, she

was subject to Defendant's confidentiality policy. (Def.'s Exhibit B, HIPPA

Confidentiality/Security Compliance Agreement, ECF No. 13-2). Under the terms of the policy: "an employee may only refer to a patient's chart or access computer information when it is essential to his or her work responsibilities. Referring to medical information for other purpose or otherwise breaching this duty of confidentiality may be a cause for immediate dismissal." (*Id.*) (underline in original). On June 2, 2011, Plaintiff signed Defendant's Employee Acknowledgment and Receipt and HIPPA Confidentiality/Security Compliance Agreement. (*Id.*). Plaintiff also received HIPPA training and email reminders regarding patient confidentiality throughout the course of her employment. (*Id.*). For example, on December 16, 2013, Defendant sent a HIPPA Security Awareness reminder on December 16, 2013 which stated: "Your role may allow access to patient accounts. Unless, you are working directly with the patient or provider you should not be in the patient's record. This includes your own record if you are a patient of the practice." (Pl.'s Depo. Exhibit B).

Plaintiff testified that, on or around June 17, 2014, she was approved for and began taking intermittent Family Medical Leave Act ("FMLA") leave for her medical conditions, including: gastroesophageal reflux disease ("GERD"), chronic sinusitis, depression, anxiety, bronchitis, neck pain, trapezius strain, chronic venostasis, bilateral knee pain, seasonal allergies, hypoglycemia, and high blood pressure. (Pl.'s Aff. ¶ 7). Plaintiff also testified that she requested reasonable accommodations for her medical conditions. (*Id.* ¶ 8). In her deposition, Plaintiff testified as follows:

> Q. During the three years prior to your termination, you took FMLA leave every year; correct?
>
> A. Yes.
>
> Q. You actually took it most months; can we agree?
>
> A. Yes.

2

Q. And during that time, had you ever been suspended?

A. No.

Q. During that time you got regular raises; right?

A. Yes.

Q. During that time was your job ever threatened you might be terminated?

A. I was talked to about my absenteeism.

Q. [Were you] ever told you might be terminated during the three years prior to the time you accessed your medical records three times in 24 hours before you were terminated?

A. No.

Q. Okay. You had requested accommodations for your disabilities multiple times in the years that you worked for Ohio Gastro; is that right?

A. Say that again, please.

Q. You requested accommodations for your disabilities multiple times in the years that you work with Ohio Gastro?

A. Yes.

Q. During all those years you requested accommodations, you continued to receive raises; correct?

A. On my merit and for what I did, yes.

(Pl.'s Depo. 44:8–45:16, ECF No 16-1).

According to a letter from Human Resources Manager Heather Foisset ("Manager Foisset") to Director of Operations Megan Dana ("Director Dana"), Plaintiff got "combative" in a December 8, 2015 meeting regarding her FMLA leave. (Def.'s Exhibit J, ECF No. 12-1). Manager Foisset wrote: "I was stern with her so she may complain (I gave Frank a heads up too). Going forward, I am going to have a witness with me every time I talk to her as she twists my

words. She thinks I'm out to get her when in reality I am trying to help her with her FMLA." (*Id.*).

On May 20, 2015, Plaintiff received a low score of "2" out of "5" on the Attendance and Punctuality section of Defendant's 2014-2015 Annual Billing Performance Evaluation. (Pl.'s Exhibit B, ECF No. 15-3). The evaluation noted: "Benita is on FMLA," and further stated: "Benita is very dependable and strives to keep all her tasks up to date; however, she's been sick lately and has had to take a lot of days off and I know her work is not where she would want it to be." (*Id.*). On May 18, 2016, Plaintiff received the same score on the Attendance and Punctuality section of Defendant's 2015-2016 Annual Billing Performance Evaluation. (Pl.'s Exhibit C, ECF No. 15-3). This time the evaluation stated: "Benita has missed a few days of work." (*Id.*). Plaintiff testified that: "[b]ased on this score and comments, I believe that OGGI was discriminating against me due to my serious medical conditions and disabilities, which required me to take FMLA leave." (Pl.'s Aff. ¶ 12).

Plaintiff testified that she requested several accommodations from Defendant which were never granted. Specifically, Plaintiff testified:

> Q. . . . if you could tell me all of the times that you requested an accommodation and you were not granted that accommodation while employed at Ohio Gastro Enterology.
>
> A. There were perfume smells. The air vents. The telephone. That's all I can remember right now.
>
> Q. All right. So you—
>
> A. Oh, restroom.
>
> Q. Let's take those one at a time. Let's start with restroom. You requested an accommodation with respect to the restroom. Tell me about that.
>
> Q. Because of being on the phones, customers, patients were on hold for a period of time. Amber had told us we were not allowed to use the restroom during the

phone time. And she had stated that in one of our meetings. And she told us we had to be on the phone during that time. Somebody said, what about the restrooms? And she said, go before or after. And because of the medicine I'm on, I would have to use the restroom frequently. Being on the phones at that time, I would need to use the restroom. And there was a time where I had to use the restroom, but because I was told we had to use it before or after, I had literally peed myself at my desk.

(Pls.' Depo. 66:11–67:13). Plaintiff testified that she explained her situation to Billing Manager

Amber Pohlman ("Manager Pohlman") as follows:

Q. You went to her [Manager Pohlman] personally a couple of days later and she said to you, get someone to watch the phones while you go [to the restroom]?

A. Yes.

Q. You explained to her, that might not work sometimes?

A. Yes.

Q. Sometimes it would work; sometimes it might not?

A. Yes.

Q. She said, do the best you can?

A. Yes.

Q. Did she leave it at that?

A. Yes.

Q. Was there any other accommodation you asked with respect to the phones?

A. To be taken off the phone rotation.

Q. Did they accommodate you in that regard?

A. No.

(*Id.* at 72:20–73:14). In her affidavit, Plaintiff testified that Manager Pohlman "did not seem to understand my condition and appeared resistant to my requests." (Pl.'s Aff. ¶ 16).

Finally, Plaintiff testified that Defendant failed to make adequate accommodations concerning air vents and perfume smells. (Pl.'s Depo. 75:19–77:20). According to Plaintiff, she suffered sinus infections due to an air vent directly above her desk. (*Id.* at 75:21–76:3). Plaintiff testified that Defendant made numerous attempts to adjust or fix the thermostat, but eventually declined to correct the issue because "the part that was needed to help deflect the air was expensive." (*Id.* at 76:18–19). In addition, Plaintiff testified that an employee wore a certain perfume scent which caused her nasal cavity to swell. (*Id.* at 77:1–16). Plaintiff testified that management sent emails asking individuals not to wear perfume in response to her complaints. (*Id.* at 77:2–6). However, Plaintiff further testified:

> for a period of time I was good, you know, [the smells] subsided. And then all of a sudden, it started back up again. And we were told [management was] not going to stop people from wearing perfumes. The one person that wore this particular perfumed lotion felt that her rights were being infringed on.

(*Id.* at 77:6–12).

On May 16, 2017, Plaintiff met with Manager Foisset and Manager Pohlman regarding her FMLA certification paperwork. (Pl.'s Aff. ¶ 19). Plaintiff testified that Manager Foisset and Manager Pohlman "suddenly instructed me to submit a separate FMLA Certification of Health Care Provider for each of my serious conditions." (*Id.*). Plaintiff testified the change "didn't make sense" because her FMLA paperwork was previously accepted with "everything listed on one sheet." (Pl.'s Depo. 57:7–8). According to Plaintiff's testimony, she asked Manager Foisset "am I the only one that has to [complete separate forms for different conditions]? " (*Id.* at 105:16–17). Plaintiff testified that Manager Foisset responded: "you are the only one with this many problems." (*Id.* at 105:17–18). Plaintiff further testified that "[Manager Foisset's] tone to me was telling me I am a problem." (*Id.* at 109:3).

Plaintiff acknowledged that her new certification form was due in June 2017, but she failed to produce the form on time. (*Id.* at 59:7–14). According to Plaintiff, the delay was prompted by her doctor's refusal to fill out a separate form for each condition. (*Id.* at 61:21–62:1). Plaintiff testified: "at the time, I was going to see Dr. Stock. And I let [Manager Foisset] know that when she wanted [the FMLA paperwork] I wouldn't be able to give it to her at that time. It would be later. So—and she said that would be fine because of seeing a doctor." (*Id.* at 59:14–18).

Plaintiff testified that she was hospitalized from June 5, 2017 to June 6, 2017 for acid reflux and anxiety. (Pl.'s Aff. ¶ 28). Plaintiff testified that she notified Manager Pohlman of her illness and communicated that she would be out on FMLA leave. (*Id.* ¶ 29). Plaintiff returned to work on June 12, 2017. (*Id.* ¶ 30). By the time Plaintiff returned to work, Dr. Stock had completed Plaintiff's FMLA certification form and Defendant had a copy on file. (*Id.* ¶ 31; Pl.'s Exhibit F, ECF No. 15-3).

Plaintiff experienced severe gastrointestinal issues on June 13, 2017 which required prompt medical care. (Pl.'s Aff. ¶ 32). In her Affidavit, Plaintiff testified that she briefly accessed her electronic medical file to identify an Ohio Gastro physician who had treated her three years prior. (*Id.* ¶ 33–34). Plaintiff's chart view history indicates that she viewed her own patient records on June 13, 2017 at 1:09 PM. (Def.'s Exhibit D, ECF No. 12-1). Plaintiff testified that after accessing her chart on June 13, 2017, she sent several emails asking that her chart be locked.[1] (Pl.'s Depo. 101:9–22). Plaintiff testified: "I was going to have an EEG done,

---

[1] Defendant's patients and staff members could request to have their medical records locked. Only those authorized or specifically listed by the patient had access to locked medical records. (Merendo Depo. Exhibit B).

and I didn't want people to go in." (*Id.* at 102:5–6). Plaintiff's EEG procedure was canceled for health reasons. (*Id.* at 13:24–14:8).

Plaintiff accessed her own patient records again on June 14, 2017 at 11:15 AM and 1:20 PM. (Def.'s Exhibit D). According to Plaintiff's deposition, she accessed her chart a second time to see if it was locked. (Pl.'s Depo. 103:8–10). However, in her Affidavit, Plaintiff testified that she accessed her chart on June 14, 2017 at 11:15 AM in order to conduct her normal billing activities. (Pl.'s Aff. ¶ 45–47). Plaintiff further testified that "[a]t 1:20 p.m., I briefly accessed my electronic medical file to confirm that OGGI had locked it. I did not change or modify anything in my file. At this time, OGGI had still not locked my file, in violation of my privacy request." (*Id.* ¶ 49–50). As evidenced by Plaintiff's chart view history, numerous individuals opened her chart after she accessed it at 1:09 PM on June 13, 2017. (Def.'s Exhibit D). Specifically, Plaintiff's chart was accessed eleven times between June 13, 2017 and June 14, 2017—not including the three times Plaintiff opened her own chart. (*Id.*).

Plaintiff testified that Manager Foisset and Director of Operations Megan Dana called her into the office for a meeting on June 14, 2017 around 2:30 PM. (*Id.* ¶ 51). According to the testimony of Manager Foisset:

> A. So that particular day, our director of nursing, Debbie Sauls, came to me and said that her charge nurse had discovered that Ms. Merendo was in her file. I went to Megan, who is our HIPPA privacy officer, to discuss the matter. Megan looked into it. We discussed the policy. We then went to Frank Chapman, who we both report to, and discussed it with him and we decided to meet with Ms. Merendo.
>
> Q. And what were you planning to say to her during that meeting?
>
> A. Most likely—I don't recall specifically what we said to her, but I think—we acknowledged that she was in her file, it was a terminable offense.

(Foisset Depo. 13:3–18, ECF No. 13-3). Director Dana testified:

Heather came and got me that day and said that she had received a complaint of a—that Ms. Merendo had been in her own medical records from a nurse in the surgery center. She asked me, as the HIPPA officer, to look into the complaint. So I went back, was able to pull up the chart and view that Ms. Merendo had accessed her record multiple times. We then went back—I showed that to Heather, went over the policy with Heather. Went to Frank Chapman, our COO, kind of ran by what we were dealing with and told him what was going on. He stated, Follow policy. Heater and I went back at that point and discussed the issue and decided to meet with Ms. Merendo.

(Dana Depo. 11:7–23, ECF No. 13-5). Director Dana further testified that Defendant had

previously terminated registered nurse Kristie Sisson ("Nurse Sisson") for accessing her own

medical records. (*Id.* at 12:16–24).

According to Plaintiff's testimony, the meeting went as follows:

[Manager Foisset] called and asked me to come into her office. And I said, should I bring my stuff? And she said, just get in here. And so I went back and she shut the door, Heather. And she said, Benita, it's been brought to our attention that you were in your medical record. And because of that, we are going to have to let you go. And so I was beside myself, because in my head it didn't make sense.

(Pl.'s Depo. 10:3–11). Plaintiff further testified: "I sat there and didn't say anything, because I

was shocked. And then they continued to talk." (*Id.* at 39:23–40:1). Manager Foisset testified

that she could not recall Plaintiff's exact response, "but [Plaintiff] brought up she was in her file

for billing purposes." (Foisset Depo. 14:3–6). Director Dana gave a similar statement,

testifying: "Ms. Merendo told us that she was in the chart because she was billing for her office

visit as she was directed by her supervisor." (Dana Depo. 13:12–14).

Plaintiff testified that she did not understand the termination because her supervisor,

Manager Pohlman, had instructed her to handle office charges. (*Id.* at 12:10–21). According to

Plaintiff's deposition testimony, office charges are a billing function in which staff members post

patients' visits with doctors. (*Id.* at 11:24–12:4). Plaintiff testified:

9

Q. The import of that would have been [Manager Pohlman] sending an email to help out with office charges?

A. Amber sent an email telling me what to do when she was gone.

Q. What did she tell to you do?

A. Well, there were a few emails during that period of time to do specific office charges. And then the office charge that she sent before she went on vacation.

Q. What would that email from Amber have required you to do with your chart?

A. It would have fallen under doing office charges.

Q. What specifically were you required to do in your chart based up on the email from Amber?

A. Well, I would have gone into the chart, looked at the documentation, and then processed it accordingly.

(*Id.* at 12:13–13:6). Plaintiff further testified that she did not explain her personal reasons for accessing her medical file. Specifically, Plaintiff testified:

I did not know or believe it was against policy to access my own electronic medical file (again, it was comprised of my personal, confidential information, and I did not make any changes to it) so I did not know that I needed to explain my reasons for accessing it.

(Pl.'s Aff. ¶ 59). Manager Foisset testified:

I looked at Megan—Megan agreed to table the conversation. I sent Ms. Merendo back to her desk. Megan looked in the record and determined that the record— the portion of the record she was in had nothing to do with what she said she was billing for. So we determined she was dishonest. So she lied to us. So we decided to meet again and terminate Ms. Merendo.

(Foisset Depo. 14:14–22). Director Dana testified: "[t]he parts of the chart that [Plaintiff] was in were not related to office charges. So that would not have been why she was in those parts of the chart." (Dana Depo. 16:8–12).

Fifteen minutes after their original meeting, Manager Foisset and Director Dana called Plaintiff back into the office and terminated her employment. (Pl.'s Aff. ¶ 57). Plaintiff

10

testified: "[a]t no time during either of these meetings did Manager Foisset or Director Dana provide me with information or documentation supporting their allegations that I was dishonest or lying about my medical file." (*Id.* ¶ 58). However, according to Manager Foisset's testimony, Plaintiff "looked at her file for personal gain" and then "lied about it." (Foisset Depo. 21:8–12). Director Dana testified that "[Plaintiff's] reason for termination was violation of the HIPPA policy." (Dana Depo. 20:3–4).

## B. Procedural History

On September 15, 2017, Plaintiff filed the instant action before this Court. (Pl.'s Compl., ECF No. 1). Plaintiff asserts eight counts in her pleadings, including: (1) disability discrimination under Ohio Revised Code § 4112.02, (2) disability discrimination under the Americans with Disabilities Act ("ADA"), (3) retaliation in violation of the Family Medical Leave Act ("FMLA"), (4) interference in violation of the FMLA, (5) retaliation under O.R.C. § 4112.02, (6) retaliation under the ADA, (7) failure to accommodate under the ADA, and (8) failure to accommodate under O.R.C. § 4112.02. (Pl.'s Compl.).

On October 31, 2018, Defendant moved for summary judgment on all claims. (Def.'s Mot. for Summ. J., ECF No. 12). Plaintiff filed her Response in Opposition on November 21, 2018. (Pl.'s Opp'n, ECF No. 15). On December 5, 2018, Defendant filed its Reply. (Def.'s Reply, ECF No. 17). Defendant's Motion for Summary Judgment is now ripe for review.

## II.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248, *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## III.

### A.  Disability Discrimination Under the ADA and Ohio Law

Congress enacted the ADA in 1990 to prohibit public entities from discriminating against qualified individuals with disabilities. 164 A.L.R. Fed. 433 § 2(a). The statute also specifically prohibits public employers from "excluding such an individual from participation in, or denying the individual the benefits of, any of the entity's services, programs, or activities." 164 A.L.R. Fed. 433. "Historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." *Olmstead v. L.C. ex. Rel. Zimring*, 527 U.S. 581, 600 (1999) (quoting 42 U.S.C. § 12101(a)(5)).

12

To establish a *prima facie* case of disability discrimination under the ADA, a plaintiff must prove that:

> (1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. The defendant must then offer a legitimate explanation for its action. If the defendant satisfies this burden of production, the plaintiff must introduce evidence showing that the proffered explanation is pretextual. Under this scheme, the plaintiff retains the ultimate burden of persuasion at all times.

*Monette v. Electronic Data System Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996). *See also Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (adopting the five-part test presented in *Monette*); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–806 (1973) (providing the burden-shifting framework). According to the Sixth Circuit, "[p]roof of these five facts, in the absence of an explanation by the employer, creates a mandatory inference that the employer intentionally discriminated against the disabled individual." *Monette*, 90 F.3d at 1186.

"Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason' for its actions." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008) (quoting *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001)). "If the defendant can satisfy its burden, the plaintiff must show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination." *Id.*

As previously noted by this Court, "Ohio disability discrimination law generally applies the same analysis as the ADA." *Johnson v. JPMorgan Chase & Co.*, 922 F. Supp. 2d 658, 674 n.6 (S.D. Ohio 2013) (citing *Jakubowski v. Christ Hospital, Inc.*, 627 F.3d 195, 201 (6th Cir. 2010)). In fact, Ohio courts "look to regulations and cases interpreting the [ADA] for guidance

in [their] interpretation of Ohio law." *Johnson*, 922 F. Supp. 2d at 674 n.6 (quoting *City of Columbus Civil Service Commission v. McGlone*, 82 Ohio St. 3d 569, 573 (1998)). Both parties analyze Plaintiff's disability discrimination claims under the ADA. Accordingly, this Court will analyze Plaintiff's ADA and Ohio disability discrimination claims together.

First, Defendant argues that Plaintiff's *prima facie* case for disability discrimination must fail. (Def.'s Mot. for Summ. J. at 6).[2] Defendant contends that Plaintiff "cannot show a connection between her termination and her disabilities." (*Id.*). Defendant points out the only adverse employment action that Plaintiff experienced was her termination. (*Id.*). Specifically, Defendant cites Plaintiff's deposition testimony that: (1) Plaintiff received pay increases each year, and (2) Plaintiff was never penalized for using FMLA leave. (*Id.*) (Pl.'s Depo. 43:8–19; 46:15–21).

Moreover, Defendant avers that Plaintiff was terminated "for policy violations and subsequent dishonesty about said violations." (Def.'s Mot. for Summ. J. at 6). According to Defendant, Plaintiff admitted that she violated Defendant's confidentiality policy by "accessing her medical chart for non-business reasons on two separate occasions." (*Id.* at 7). Because Defendant's confidentiality policy permits termination for employee violations, it contends that Plaintiff's adverse employment action had nothing to do with her disabilities. (*Id.* at 8).

Second, Defendant asserts that even if Plaintiff could successfully make a *prima facie* case, Defendant can offer a legitimate explanation for its action under the *McDonnell Douglas* burden-shifting framework. (*Id.*). Specifically, Defendant states that its "legitimate reasons for Plaintiff's termination were her violation of company policy and being dishonest about it." (*Id.*).

---

[2] All references to page numbers in the parties' motions refer to those numbers generated by the Court's electronic filing system.

Defendant cites *Holmes v. J.P. Morgan Chase National Corporate Services, Inc.*, 2010 U.S. Dist. LEXIS 4124, at *8 (E.D. Mich. Jan. 20, 2010), where a sister district court held that violations of express company policies are legitimate, non-discriminatory reasons for adverse employment action. *See also Blackshear v. Interstate Brands Corp.*, 495 F. App'x 613, 618 (6th Cir. 2012) (finding that where a company policy provided for termination in the event of a violation, and where all previous employees found in violation were discharged, the defendant met its burden of presenting a legitimate, non-discriminatory reason for termination).

Finally, Defendant argues there is no evidence that its reasons for terminating Plaintiff were pretextual. (Def.'s Mot. for Summ. J. at 9). Defendant offers *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 364 (6th Cir. 2001), where the Sixth Circuit found that fear of retaliation, repeated comments concerning discipline, and an "atmosphere in which the plaintiff's activities were scrutinized more carefully than those of comparably situated employees" helped to establish pretext. (*Id.*). Here, Defendant points out that Plaintiff relies on a single interaction with Manager Foisset to prove pretext:

> Q. Let's back up. The question was: Am I the only one that has to get multiple forms, one for each medical condition?
>
> A. I asked if I'm the only one.
>
> Q. Heather said, you are the only one with this many problems. Are you telling me you didn't understand that to mean this many separate conditions?
>
> A. I'm telling you her tone to me was not like how you are saying it to me.
>
> Q. That's fine.
>
> A. Her tone to me was telling me I am a problem.
>
> Q. But she didn't say, you are a problem; correct? She said, you are the only one with this many problems; right? Those were her words.
>
> A. Yes.

(Pl.'s Depo. 108:15–109:7).

Defendant disputes Plaintiff's perception of her interactions with Manager Foisset. (Def.'s Mot. for Summ. J. at 10). Relying on Manager Foisset's December 9, 2015 email, Defendant points out that Manager Foisset previously characterized Plaintiff as "combative" and said Plaintiff "thinks I'm out to get her." (Def.'s Exhibit J). However, Defendant suggests that even construing the facts in favor of Plaintiff, a "one-time comment that Plaintiff found insulting due to Manager Foisset's 'tone,' is hardly equivalent to repeated comments, discipline for trivial matters, or unwarranted criticism." (Def.'s Mot. for Summ. J. at 10) (citing *Little*, 265 F.3d at 364).

Moreover, Defendant points out that Plaintiff was not treated differently than non-disabled employees who committed similar violations. (*Id.*). Director Dana testified that Nurse Sisson was terminated for accessing her own medical records. (*Id.*) (citing Dana Depo. 12:3–24). Consequently, Defendant avers it is "much more logical and likely" that Plaintiff was fired for her policy violation and subsequent dishonesty than her medical conditions. (Def.'s Mot. for Summ. J. at 11).

Plaintiff argues that she can establish a *prima facie* case for disability discrimination. First, Plaintiff contends that Manager Foisset's "pejorative comment" at their May 16, 2017 meeting constitutes direct evidence of discrimination. (Pl.'s Opp'n at 11). As noted by Plaintiff, direct evidence "proves the existence of improper discriminatory animus without inference or presumption." (*Id.*) (citing *Joostberns v. UPS, Inc.*, 166 Fed. Appx. 783, 791–792 (6th Cir. 2000)) (*see also Bhama v. Mercy Memorial Hospital Corp.*, 416 Fed. Appx. 542, 552 (6th Cir. 2011) (direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions")). In Plaintiff's view,

Manager Foisset's statement that "[y]ou [Plaintiff] are the only one with this many problems" demonstrates Defendant's clear disposition for disability discrimination. (Pl.'s Opp'n at 11–12).

Second, Plaintiff cites the "unprecedented, arbitrary" requirement to submit a separate FMLA form for each medical condition as direct evidence of Defendant's discrimination. (*Id.* at 12). According to Plaintiff, Manager Foisset's new demand for separate forms "interfered and unnecessarily delayed Plaintiff's rights," (*Id.*). In her mind, "OGGI was discriminating against her due to her serious medical condition and use of FMLA." (Pl.'s Aff. ¶ 22).

Third, Plaintiff characterizes Defendant's comments on her annual performance evaluations as direct evidence of Defendant's discriminatory actions. (Pl.'s Opp'n at 12). Highlighting the negative remarks on Plaintiff's performance evaluations regarding attendance, Plaintiff argues that Defendant penalized her "**multiple times in writing**, for her serious medical conditions which necessitated FMLA leave." (*Id.* at 12) (emphasis in original). Plaintiff cites *Dyer v. Ventra Sandusky, LLC*, 317 F. Supp. 3d 953, 957 (N.D. Ohio 2018), where the Northern District Court of Ohio held that "[e]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, nor can they count FMLA leave under a no-fault attendance policy." To Plaintiff, "[i]t is clear on its face that Defendant held Plaintiff's serious medical conditions and FMLA leave against her." (Pl.'s Opp'n at 13).

Plaintiff further contends, that even should her *prima facie* case fail, she suffered an adverse employment action "for reasons she can prove are pretextual." (Pl.'s Opp'n at 26). In other words, should the Court determine the statements above are not direct evidence, Plaintiff argues "they are certainly indirect evidence from which a reasonabl[e] jury could make a causal link between Plaintiff's termination and her FMLA leave." (*Id.* at 15).

17

In addition, Plaintiff argues the timing of her termination is significant. (Pl.'s Opp'n at 15). Plaintiff states that she returned to work on Monday, June 12, 2017 and Defendant terminated her employment "merely two (2) days later—June 14, 2017." (*Id.*). According to Plaintiff, such temporal proximity between her FMLA leave and her termination indicates a causal connection between her disability and the adverse employment action. (*Id.*). In other words, Plaintiff suggests that Defendant "seized the chance to be rid of [her] and her 'many problems.'" (*Id.*) (citing Pl.'s Depo. 105:14–18).

Finally, Plaintiff states that she was "the ***only person*** to ever be terminated for merely accessing her own confidential medical records." (*Id.*) (emphasis in original). Responding to Defendant's characterization of Nurse Sisson's termination, Plaintiff argues that Nurse Sisson was discharged for accessing her own medical records, making changes to these records, and committing excessive absenteeism. (*Id.*) (citing Dana Depo. 37:12–15). In the instant action, Plaintiff argues she did not make changes or alterations to her file, thereby maintaining the integrity of her patient records. (Pl.'s Opp'n at 21). Accordingly, Plaintiff suggests that Defendant treated other employees who violated the confidentiality policy less harshly. (*Id.* at 22). In addition to Nurse Sisson, Plaintiff references several other examples of HIPPA violations that did not (by themselves) result in termination:

- On April 30, 2015 OGGI employee Fara Allen sent a patient's PHI to the wrong medical facility, and the patient was added to the facility's system for a procedure. It was determined to be the wrong patient. (Dana Depo. 42:11–13). Ms. Allen remains employed by OGGI. (*Id.* at 42:21–22) Defendant "reviewed incident and steps to prevent."

- On June 10, 2015, OGGI discovered that an employee had included a lab order for another patient when emailing a patient's discharge paperwork and surgery. Defendant subsequently issued a "reminder to staff to double-check paperwork prior to initiating discharge."

- On June 30, 2015, an OGGI employee placed a patient's information—and pictures of their colonoscopy procedure—in the wrong chart, which was subsequently mailed out with an entirely different patient's discharge paperwork. Defendant spoke to the staff member about double-checking paperwork.

- On July 14, 2017, an OGGI Billing employee faxed a patient's claim forms to the wrong insurance company. The log produced by Defendants does not indicate that OGGI took any disciplinary action against this employee.

- On December 12, 2017, an OGGI Scheduling employee sent a document via reply email to the wrong patient, Defendant merely issued a verbal warning to the staff member.

(Pl.'s Opp'n at 22) (citing Pl.'s Exhibit P, OGGI HIPPA Violation Log, ECF No. 15-3).

Plaintiff contends these examples highlight Defendant's typical 'slap on the wrist'" approach to significant HIPPA violations. (Pl.'s Opp'n at 22–23). Plaintiff points out that Defendant "afforded these employees a second opportunity to correct their behaviors in the future"—a luxury not extended to her. (*Id.* at 23). Furthermore, Plaintiff argues that Defendant condemns her conduct as "'unauthorized' but conveniently ignores the multiple OGGI employees who viewed Plaintiff's PHI in direct violation of her privacy request." (*Id.*).

In Plaintiff's view, she accessed her medical records for a business purpose and was not dishonest. (*Id.* at 17). According to Plaintiff, she "accessed her file due to legitimate concerns that despite her privacy requests, Defendant failed to timely lock her electronic medical file." (*Id.* at 18). She suggests that Defendant improperly construes this action as "personal." (*Id.*). In addition, Plaintiff asserts that she did not lie about accessing her file for billing purposes. (*Id.*). Plaintiff contends that Director Dana and Manager Foisset's alleged investigation into her actions did not yield evidence of any dishonesty. (*Id.* at 19). Specifically, Plaintiff argues the Event Audit Log does not show which specific portions of the record she viewed. (*Id.*). Therefore, Plaintiff argues her alleged dishonesty was mere pretext for her termination.

Plaintiff also claims she did not believe she was committing a policy violation by accessing her file. (*Id.* at 20). Plaintiff's deposition testimony reflects the following:

Q. Had you known it was against the policy to look at the record, would you still have looked at it?

A. No.

Q. Had you known the rule, you would have tried to follow it; correct?

A. Yes.

(Pl.'s Depo. 85:9–15). Regardless of her intent, Plaintiff avers her actions did not constitute a terminable offense under Defendant's policy. (Pl.'s Opp'n at 23). In particular, Plaintiff notes that "[a]ccessing or viewing one's own medical file is not even listed as an example of any of the levels in OGGI's HIPPA Sanction Policy and Procedure." (*Id.* at 24). Consequently, Plaintiff views her conduct as a mere excuse for Defendant's discriminatory adverse employment action. (*Id.* at 25).

Furthermore, Plaintiff contends the policy she is accused of violating "was not clear and understood by Defendant's employees." (*Id.* at 16). Plaintiff points out that on June 15, 2017, the day after she was terminated, Defendant distributed an email reminder to employees warning: "DO NOT GO INTO YOUR CHART IF YOU ARE A PATIENT OF OHIO GASTRO" and stating: "THIS IS A TERMINABLE OFFENSE." (Pl.'s Exhibit N, ECF No. 15-3). In Plaintiff's view, this email is evidence of an unclear or ambiguous policy. (Pl.'s Opp'n at 16).

## 1. Plaintiff Can Likely Establish a *Prima Facie* Case of Disability Discrimination

At the *prima facie* stage, Plaintiff has the burden to show:

(1) she is disabled, (2) but otherwise qualified for the position with or without reasonable accommodation, (3) she suffered an adverse employment decision, (4) Defendant knew or had reason to know of Plaintiff's disability, and (5) either the position remained open, she was replaced by a non-disabled person, or a similarly-situated non-disabled employee was treated more favorably.

20

*Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011).

In the case at bar, Defendant does not dispute that: (1) Plaintiff is disabled, (2) Plaintiff was otherwise qualified for her position as a Billing Representative, and (3) Plaintiff's termination constitutes an adverse employment action. Because Plaintiff took intermittent FMLA leave on a monthly basis and requested numerous workplace accommodations, Defendant had reason to know of her disability. Finally, Plaintiff presented facts that a similarly-situated and non-disabled employee, Nurse Sisson, was not terminated for merely accessing her own medical records. (Dana Depo. 37:7–22). Both Plaintiff and Nurse Sisson accessed their own medical charts for personal reasons—Plaintiff looked up the name of her doctor and Nurse Sisson made "minor changes to her general graphics." (*Id.*). However, Director Dana testified that Defendant terminated Nurse Sisson for "a HIPPA sanction violation and excessive tardiness." (*Id.*). In contrast, Defendant allegedly terminated Plaintiff for her HIPPA violation alone.

Defendant's contention that Plaintiff cannot show a sufficient causal connection between her disability and her termination is not well taken. Although *Monette* determined its five-factor test creates a mandatory presumption that the disability was the "sole" cause of the adverse action, the Sixth Circuit no longer uses this standard. *Deister v. AAA Auto Club of Michigan*, 91 F. Supp. 3d 905, 918 (E.D. Mich. 2015) (citing *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012)). Instead, Plaintiff need only show her disability was a "but for" cause of her termination. *Lewis*, 681 F.3d at 321. Here, Plaintiff presents facts suggesting she would not have been terminated for committing a confidentiality violation but for her disability. In other words, Plaintiff contends she was punished more severely because of her disability.

Consequently, a reasonable jury could conclude that Plaintiff can establish a sufficient *prima facie* case of disability discrimination.

## 2. Defendant Had a Legitimate Reason for Plaintiff's Termination

Defendant maintains that it dismissed Plaintiff for: (1) accessing her own medical records in violation of its confidentiality policy, and (2) subsequently lying about it. Violations of express company policies are legitimate, non-discriminatory reasons for taking adverse employment action. *Holmes v. J.P. Morgan Chase National Corporate Services, Inc.*, 2010 U.S. Dist. LEXIS 4124, at *8 (E.D. Mich. Jan. 20, 2010); *Blackshear v. Interstate Brands Corp.*, 495 Fed. App'x 613, 618 (6th Cir. 2012).

Dishonesty is also a legitimate, non-discriminatory reason for terminating an employee. *Kitts v. General Telephone North, Inc.*, 2005 U.S. Dist. LEXIS 20421, at *45 (S.D. Ohio Sep. 19, 2005) (holding that the plaintiff was terminated because she lied about the reason for her absence, not because she took FMLA leave); *Conley v. City of Findlay*, 266 Fed. App'x 400, 405 (6th Cir. 2008); *see also Baugher v. Dekko Heating Technologies*, 92 Fed. App'x 328, 329 (7th Cir. 2004) (holding that where an employer believes an employee was dishonest, "it is impossible to deem the action a pretext for discrimination or an episode of retaliation").

Thus, Defendant has articulated a legitimate, non-discriminatory explanation for its adverse employment action. Accordingly, the burden shifts to Plaintiff to demonstrate that a reasonable jury could deem Defendant's explanation pretext for discrimination. *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

## 3. A Reasonable Jury Could Find Defendant's Explanation Pretextual

To prove pretext, a plaintiff must show one of the following: (1) the proffered reasons for the adverse action have no basis in fact, (2) the proffered reasons did not actually motivate

the employer's action, or (3) the proffered reasons were insufficient to motivate the employer's action. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). When invoking the second prong, a plaintiff may demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision "to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008) (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir. 2003) (*en banc*)). "[A] plaintiff must show *both* [(a)] that the employer's proffered reason was not the real reason for its action, *and* [(b)] that the employer's real reason was unlawful." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (citations omitted).

Inconsistent or contradictory statements from an employer could cast doubt on the employer's motivation, giving rise to an inference of pretext. *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 523 (6th Cir. 1997); *Morgan v. Hilti Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) ("weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in an employer's proffered non-discriminatory reasons can be evidence of pretext). In addition, a plaintiff may offer evidence of similarly situated coworkers who were treated more favorably to raise a genuine issue of fact that the defendant's proffered reasons did not actually motivate its actions. For an employer's proffered explanation to be shown as pretext on the grounds that a similarly situated employee received more favorable treatment, "the plaintiff is required to demonstrate that he or she is similarly situated to the non-protected employee in all relevant respects." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) (internal quotation marks and citation omitted).

### a. Proffered Reasons Not the Real Reasons for Termination

Plaintiff argues that Defendant's proffered reasons for taking the employment action—accessing her own medical records and acting dishonestly— did not actually motivate her termination. (Pl.'s Opp'n at 7). Specifically, Plaintiff contends that: (1) she did not violate company policy, (2) even if a violation occurred, she did not know she was violating company policy, (3) the company policy is unclear, (4) she caused no harm or changes by viewing her medical records, and (5) she accessed her records for business purposes and was not dishonest. Viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff raised a genuine issue of material fact as to whether Defendant's proffered reasons actually motivated her termination. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor").

According to the Sixth Circuit, "disputes about the interpretation of company policy do not typically create genuine issues of material fact regarding whether a company's stated reason for an adverse employment action is only a pretext designed to mask unlawful discrimination." *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 558 (6th Cir. 2009). "[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Id.* Citing *Majewski v. Auto. Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). The Sixth Circuit went on to assert: "[t]he key inquiry in assessing whether an employer holds such an honest belief is whether the employer made a reasonably informed and considered decision before taking the complained-of-action." *Id.* Citing *Michael v. Caterpillar Financial Service Corp.*, 496 F.3d 584, 598–599 (6th Cir. 2007).

Here, Plaintiff argues that Defendant's Standards of Work-Related Behavior Policy does not expressly prohibit an employee from accessing his or her own medical records. The policy reads, in relevant part: "an employee may only refer to a patient's chart or access computer information when it is essential to his or her work responsibilities. Referring to medical information for other purpose[s] or otherwise breaching this duty of confidentiality may be a cause for immediate dismissal." (Pl.'s Depo. Exhibit B) (emphasis in original). In addition, Plaintiff accurately notes that she did not commit any of the five HIPPA violations constituting terminable offenses under Defendant's HIPPA Sanction Policy and Procedure (Pl.'s Opp'n at 23; Pl.'s Exhibit Q, ECF No. 15-3).

Taken alone, Plaintiff's interpretation of company policy may be insufficient to raise a genuine dispute of material fact under *Sybrandt*. However, Plaintiff disputes whether Defendant had an honest belief in its proffered reasons for terminating Plaintiff. Defendant alleges that Plaintiff accessed her own medical chart "with no apparent business-related reason to do so." (Def.'s Mot. for Summ. J. at 4). Yet Plaintiff testified that, prior to leaving on vacation, Manager Pohlman instructed her to handle office charges. (Pl.'s Depo 12:10–21). Plaintiff further testified that Manager Pohlman's instructions required her to "[go] into the chart, [look] at the documentation, and then [process] it accordingly." (*Id.* at 13:4–5). Thus, Plaintiff argues she accessed her chart at the direction of her supervisor—rendering her immediate dismissal unreasonable. In addition, Plaintiff contends that she accessed her chart for a second time "due to legitimate concerns that despite her privacy requests, Defendant failed to timely lock her electronic medical file." (Pl.'s Opp'n at 18). Again, Plaintiff avers that her action fell within the purview of her job responsibility to "[m]aintain confidentiality of patient and financial information." (Def.'s Exhibit A).

Finally, Plaintiff challenges whether Defendant "made a reasonably informed and considered decision" before terminating her. According to Manager Foisset's testimony, Director Dana "looked in the record and determined that the record—the portion of the record [Plaintiff] was in had nothing to with what [Plaintiff] said she was billing for." (Foisset Depo. 14:16–19). However, Plaintiff asserts that Manager Foisset and Director Dana never provided any information or documentation to prove that Plaintiff lied about accessing certain sections of her file. (Pl.'s Opp'n at 18–19). Plaintiff further argues that Defendant's decision-making process did not account for a general lack of clarity regarding company policy. When asked "[d]id you ever read the policy about employees not accessing their own medical records?"— Plaintiff testified "[n]o. I believed that those files were mine." (Pl.'s Depo. 84:17–19). Finally, Plaintiff points out that, despite the lack of proof as to her alleged violation and subsequent dishonesty, Manager Foisset and Director Dana spent a mere fifteen minutes reaching the decision to terminate her. (Pl.'s Depo. 22:9–10).

Accordingly, Plaintiff raised a genuine dispute of material fact as to whether Defendant had an honest belief in its proffered nondiscriminatory reasons for the adverse action.

### b.    Real Reason for Termination is Unlawful

Having raised a dispute of material fact as to whether Defendant's proffered reasons were the real reasons for Plaintiff's termination, Plaintiff must show sufficient facts to establish that Defendant acted with a discriminatory and/or retaliatory animus. *E.E.O.C.*, 782 F.3d at 767. Plaintiff points to several facts in the record as proof of Defendant's alleged discriminatory intent, including: (1) Ms. Foisset's comment about Plaintiff's medical conditions, (2) Defendant's change to Plaintiff's FMLA paperwork process, (3) negative comments on Plaintiff's performance evaluation for taking FMLA leave, (4) the temporal proximity between

Plaintiff's FMLA leave and her termination, and (5) the disparate treatment of Plaintiff compared to similarly-situated employees.

The Court first considers Manager Foisset's potentially discriminatory remark. The parties dispute Manager Foisset's intent when she made the comment: "[y]ou are the only one with this many problems." (Pl.'s Depo. 105:17–18). Defendant contends that even if Manager Foisset's comment was subjectively offensive to Plaintiff, it does not establish pretext. (Def.'s Mot. for Summ J. at 10). Defendant cites *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987), where the Sixth Circuit found that "an employee's **subjective perception** that she has suffered discrimination, in the absence of objective evidence substantiating such perception, does not constitute probative evidence of such discrimination." (emphasis added). Here, Manager Foisset's comment could reasonably be interpreted as a mere statement of fact or a discriminatory insult. Standing alone, Plaintiff's perception of a single comment is not sufficient to establish a genuine dispute of material fact. However, Plaintiff presents additional evidence of Defendant's alleged discriminatory motive.

First, Plaintiff identifies Defendant's "arbitrary" change to her FMLA paperwork as evidence of pretext. In *Harrison v. Proctor & Gamble Distributing, LLC*, 290 F. Supp. 3d 723, 746–747 (S.D. Ohio 2017), this Court considered whether a discrepancy in how the defendant treated the plaintiff's FMLA leave requests prior to 2012 versus during 2012 amounted to pretext. This Court concluded that the employer's actions were not motivated by the FMLA leave. *Id.* at 747. Noting that the plaintiff took FMLA leave "for 'almost the entirety of' her 17 year career at P&G, and did so without significant incident until 2012," this Court found that any disciplinary action was likely the "result of changed company policy" or the plaintiff's failure to

provide timely FMLA notice. *Id.* In other words, "[t]he fact that Plaintiff was able to use FMLA leave without incident for over a decade belies any argument" of pretext. *Id.*

This case presents similar, but not identical, facts. Plaintiff testified that she took FMLA leave almost monthly for three years. (Pl.'s Depo. 44:6–14). Three years is a significantly shorter time-period than the *Harrison* plaintiff's 17-year career. Moreover, when Plaintiff inquired if she was the only one required to fill out separate FMLA forms, Manager Foisset evaded the question by responding: "[y]ou are the only one with this many problems." (Pl.'s Depo. 105:17–18). Additionally, Plaintiff testified that her doctor initially refused to complete separate FMLA forms, stating "Dr. Stock was not going to [fill out separate FMLA forms]. (*Id.* at 61:21–24).

Taken together, this testimony raises a reasonable inference that Defendant departed from usual practice and discriminated against Plaintiff by forcing her to fill out additional FMLA paperwork due to her disability. Alternatively, like the *Harrison* defendant, Defendant may have been driven by a change in company policy, an effort to keep better FMLA records, or both. This dispute of fact is relevant to whether Plaintiff's disability motivated Defendant's adverse employment action.

Second, Plaintiff offers objective evidence that she received negative comments on her performance evaluations for taking FMLA leave. (Pl.'s Depo. Exhibit B). As Plaintiff accurately points out, employers may not "use the taking of FMLA leave as a negative factor in employment actions." *Dyer*, 317 F. Supp. 3d at 957. Plaintiff suggests "[t]here is an inference to be drawn from Defendant's penalizing Plaintiff with low attendance and Punctuality scores on two annual performance evaluations—that Defendant discriminated against Plaintiff because of her FMLA leave." (Pl.'s Opp'n at 13). Defendant does not dispute the negative comments on

Plaintiff's performance evaluations regarding attendance. Rather, it argues they are not evidence of pretextual discrimination because the individual making the comments, Stella Nyinaku ("Supervisor Nyinaku"), was not involved in Plaintiff's termination decision. (Def.'s Reply at 2–3). This Court disagrees.

Low performance review scores alone do not constitute an adverse employment action. *Foster v. Michigan*, 573 Fed.App'x 377, 395 (6th Cir. 2014) (holding that "[u]nless this negative evaluation had palpable negative effects, it is not actionable"). However, poor performance reviews may be evidence of pretext where the plaintiff can prove a causal connection between the low marks and an adverse employment action. *Geiger v. Pfizer, Inc.*, 2008 WL 4346781, at *7 (S.D. Ohio, Sept. 18, 2008).

In the instant action, Plaintiff received satisfactory scores in every other performance review category—including overwhelmingly positive statements such as: "Benita is responsible for Collections and does a fantastic job keeping up with collections for all 33 doctors," and "Benita is very dependable and strives to keep all her tasks up to date." (Pl.'s Depo. Exhibit B). Accordingly, Plaintiff's pretext argument does not fail on account of mixed or poor performance reviews. *See Becker v. Elmwood Local School District*, 519 Fed.App'x 339, 343–344 (6th Cir. 2013) (defendant's decision not to rehire teacher was not pretextual because, two suspect performance reviews aside, his other evaluations were "mixed at best").

Furthermore, Supervisor Nyinaku's role in Plaintiff's termination decision is not dispositive. As Plaintiff accurately points out, discriminatory remarks, even by a non-decisionmaker can be evidence of pretext. *Risch v. Royal Oak Police Department*, 281 F.3d 383, 393 (6th Cir. 2009). Because such statements, "standing alone, generally do not support an inference of discrimination," the Court must evaluate their probative value. *Ercegovich*, 154

F.3d at 356–357. Relevant factors include: "'the declarant's position in the [employer's] hierarchy, the purpose and content of the statement, and the temporal connection between the statement and the challenged employment action' . . . as well as whether the statement buttresses other evidence of pretext." *Id.* at 357. Citing *Ryder v. Westinghouse Electrical Corp.*, 128 F.3d 128, 133 (3rd Cir. 1997).

In the present case, Supervisor Nyinaku was Plaintiff's supervisor at the time the comments were made. Even though Supervisor Nyinaku was not personally involved in Plaintiff's termination decision, a reasonable jury could infer the low marks reflect an anti-FMLA sentiment in Defendant's management team. Because annual performance reviews generally highlight employee weaknesses and areas of improvement, a reasonable jury could also infer the purpose of Supervisor Nyinaku's low marks was to discourage Plaintiff from taking FMLA leave. Furthermore, although Defendant issued the two performance reviews in May 2015 and May 2016—over a year before terminating Plaintiff in June 2017—the Sixth Circuit previously found that a fourteen-month gap between a discriminatory comment and an adverse action was "not too attenuated" to support a discriminatory bias. *Ercegovich*, 154 F.3d at 357. Finally, these low marks and negative comments merely bolster Plaintiff's other evidence of pretext.

Third, the temporal proximity between Plaintiff's FMLA leave and termination supports a finding of pretext. The Court notes that temporal proximity between disability leave and termination is not determinative. *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). In *Donald*, the plaintiff argued that Defendant's decision to terminate her employment the day after returning from a medical absence was sufficient evidence of pretext. *Id.* at 763. The Sixth Circuit disagreed, stating that "the law in this circuit is clear that temporal proximity cannot be

the sole basis for finding pretext." *Id.* (citing *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309, 317 (6th Cir. 2001) ("temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual")).

However, temporal proximity combined with evidence of other discriminatory conduct can, in certain circumstances, be sufficient to raise a genuine dispute of material fact. *Little*, 265 F.3d at 363–364. Here, Plaintiff was discharged approximately two days after returning from seven days of FMLA leave. This fact, combined with Manager Foisset's comment, the FMLA paperwork change, and Supervisor Nyinaku's negative performance review remarks regarding Plaintiff's FMLA leave, raises a genuine dispute concerning Defendant's true motivation for terminating Plaintiff.

Finally, the Court considers Plaintiff's assertion that she was treated differently than other non-disabled employees. As stated *supra*, Plaintiff can prove pretext by demonstrating: (1) she was treated differently than a non-protected employee, and (2) "that he or she is similarly situated to the non-protected employee in all *relevant* respects." *Clayton*, 281 F.3d at 612 (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998) (emphasis in original)). In *Clayton*, an African-American employee and a white employee committed the same infraction. *Clayton*, 281 F.3d at 612. The African-American employee was discharged, while the white employee was not. *Id.* This Court held the defendant's actions did "not give rise to an inference of discrimination" because the African-American employee seriously injured a coworker, whereas the white employee did not. *Id.*

In the case at bar, Plaintiff argues that she is similarly situated to three non-disabled employees who committed HIPPA violations in 2015, as well as Nurse Sisson. Plaintiff's comparisons to the non-disabled individuals disciplined for HIPPA violations are not well taken.

31

None of the individuals cited in Plaintiff's examples accessed their own medical charts. (Pl.'s Exhibit P). However, Plaintiff raises a factual dispute over whether she and Nurse Sisson are similarly situated. As discussed *supra*, Plaintiff and Nurse Sisson violated the exact same policy by accessing their medical records for a personal reason.

Furthermore, unlike the employees in *Clayton*, neither Plaintiff nor Nurse Sisson harmed fellow employees or other patients with their respective violations. Yet Director Dana testified that Nurse Sisson was terminated for both: (1) accessing her own medical records, and (2) excessive tardiness. (Dana Depo. 37:7–22). In contrast, Director Dana testified that Plaintiff's "reason for termination was violation of the HIPPA policy." (*Id.* at 20:1–4). Accordingly, Plaintiff asserts that she was treated more harshly than Nurse Sisson due to her disability. Once again, this fact is insufficient to raise pretext on its own. But combined with Plaintiff's other evidence, it supports a genuine dispute of material fact regarding Defendant's motivation for terminating Plaintiff.

Because a reasonable jury could find Defendant's non-discriminatory explanation pretextual, Defendant's Motion for Summary Judgment on Plaintiff's disability discrimination claims is **DENIED**.

## B. FMLA Claims

Plaintiff further argues that Defendant violated her rights under the FMLA. (Pl.'s Opp'n at 9). The FMLA "entitles qualifying employees to up to twelve weeks of unpaid leave each year if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (citing 29 U.S.C. § 2615(a)(1)(D)). As Plaintiff correctly states, there are two theories of recovery under the FMLA statute: (1) the retaliation or

discrimination theory arising from § 2615(a)(2), and (2) the interference theory arising from § 2615(a)(1). *Hunter v. Valley View Local Schools*, 579 F.3d 688, 691 (6th Cir. 2009) (citing 29 C.F.R. § 825.220). Notably, a single act may constitute both FMLA retaliation and interference. *Wallner v. J.J.B. Hilliard, W.L. Lyons LLC*, 590 Fed. App'x 546, 551 (6th Cir. 2014). Plaintiff alleges FMLA claims under both theories.

### 1. Retaliation Under the FMLA

Pursuant to 29 U.S.C. § 2615(a)(2), an employer may not discriminate or retaliate against an employee for taking FMLA leave. Thus, employers are prohibited from "us[ing] the taking of FMLA leave as a negative factor in employment actions." *Hunter*, 579 F.3d at 690 (citing 29 C.F.R. § 825.220). A Plaintiff may demonstrate a *prima facie* case by showing: (1) she invoked a protected right under the FMLA, (2) she suffered an adverse employment action, and (3) there was a causal connection between the two. *Wallner*, 590 Fed. App'x at 551. *See also Seeger*, 681 F.3d at 283.

The law is less clear regarding the defendant's responsive burden. Where a plaintiff sets forth an FMLA claim based on circumstantial evidence alleging a single motive (i.e., discrimination), it is evaluated under the familiar *McDonnell Douglas* burden-shifting framework. *Seeger*, 681 F.3d at 283. That is, first the employee must establish a *prima facie* case; if this is done, the employer must articulate a lawful explanation for its conduct; then the burden shifts back to the employee to prove that the statute has been violated. *McDonnell*, 411 U.S. at 800–806.

However, the Sixth Circuit has hinted at a distinction between FMLA retaliation claims premised on a single-motive versus those premised on a mixed-motive. *Hunter*, 579 F.3d at 694 n.2 ("the standard depends not on the type of evidence presented (direct versus circumstantial),

but on the type of claim brought (single-motive versus mixed-motive)"). In *Wallner*, 590 Fed. App'x at 552, the Sixth Circuit noted that because the FMLA statute uses the language "a negative factor," the FMLA retaliation standard "envisions that that the challenged employment decision might also rest on other, permissible factors." The *Wallner* court found that where an employer's adverse decision was based on both permissible and impermissible factors (i.e., mixed motive), the defendant may only avoid liability "by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken [the plaintiff's FMLA rights] into account." *Id.* [3]

In the case *sub judice*, Plaintiff asserts FMLA retaliation under both single-motive and mixed-motive theories. As noted in *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008), the "burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim."[4] Therefore, the Court will first analyze Plaintiff's claim under the more stringent *McDonnell-Douglas* standard for purposes of resolving Defendant's Motion.

Plaintiff contends that she can establish a *prima facie* case for FMLA retaliation, and that Defendant's proffered reasons for terminating Plaintiff are pretextual. This Court agrees. Plaintiff invoked a protected right under the FMLA by taking FMLA leave. Plaintiff also

---

[3] This burden-shifting approach was first articulated by the Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) in the context of Title VII cases.

Despite the Sixth Circuit's application of the *Price Waterhouse* burden-shifting standard for mixed motive FMLA cases in *Wallner*, the law remains unsettled. The *Wallner* court noted that the parties agreed to apply the *Price Waterhouse* scheme to the plaintiff's mixed motive claim. Accordingly, the court declined to hold that "mixed-motive plaintiffs generally do not need to resort to the McDonnell Douglas burden-shifting scheme in order to forestall summary judgment." *Wallner*, 590 Fed. App'x at 557 n.3.

[4] The Court acknowledges that *White* pertains to a Title VII gender discrimination claim, rather than an FMLA retaliation claim.

experienced an adverse employment action when she was terminated. Relying on the same evidence as presented on her ADA claim, Plaintiff argues Defendant's verbal and written comments, her reduced performance evaluation scores, and the temporal proximity between her FMLA leave and her termination raise a genuine dispute of material fact regarding causation. (Pl.'s Opp'n at 15). Because the "burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). Accordingly, the Court finds that Plaintiff presented a *prima facie* case.

The Court further holds that a reasonable jury could find Defendant's non-discriminatory explanation pretextual. As discussed in subsection (A)(3), Plaintiff presents several facts which, when combined, raise a genuine dispute of material fact regarding Defendant's motivation for terminating Plaintiff. Because Plaintiff's FMLA retaliation claim survives Defendant's Motion under the single motive *McDonnell Douglas* framework, the Court declines to address the application of the mixed motive theory. The Court **DENIES** Defendant's Motion for Summary Judgment regarding Plaintiff's FMLA retaliation claim.

### 2. Interference Under the FMLA

Pursuant to 29 U.S.C. § 2615(a)(1), it is unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA statute]." To demonstrate a *prima facie* case, Plaintiff must show: (1) she is an eligible employee, (2) the defendant is a covered employer, (3) the employee was entitled to leave under the FMLA, (4) the employee gave the employer notice of her intention to take leave, and (5) the

employer denied the employee FMLA benefits to which she was entitled. *Cavin v. Honda of America Manufacturing, Inc.*, 346 F.3d 713, 719 (6th Cir. 2003).

Although the Sixth Circuit has not yet addressed the applicability of *McDonnell Douglas* to FMLA interference claims, "other courts have concluded that the familiar burden-shifting analysis set forth in [*McDonnell Douglas*] does not apply to § 2615(a)(1) claims." *Hoge v. Honda of America Manufacturing*, 2002 WL 485028, at *5 (S.D. Ohio Feb. 14, 2002). *See Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711 (7th Cir. 1997); *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112 (9th Cir. 2001); *Hunt v. Rapides Healthcare Sys., LLC*, No. 00–31260, 2001 WL 1650961 (5th Cir. Dec. 26, 2001).

Plaintiff argues that Defendant used FMLA leave as a negative factor in her termination. (Pl.'s Opp'n at 9). Although the "negative factor" language is usually associated with FMLA retaliation claims, Plaintiff points out that "this negative-factor analysis is applicable in analyzing an interference claim." *Wysong v. Dow Chemical Co.*, 503 F.3d 441, 447 (6th Cir. 2007). Therefore, "[i]f an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled." *Id.* The *Wysong* court further held "[w]e, therefore, have no objection to rephrasing the fifth element of an interference claim as being that the employer has "somehow used the leave against her and in an unlawful manner, as provided in either the statute or regulations." *Id.* (citing *Bradley v. Mary Rutan Hospital*, 322 F. Supp. 2d 926, 940 (S.D. Ohio 2004)).

Defendant rejects Plaintiff's view, arguing that Plaintiff analyzes her FMLA interference claim "as if it is the same as her FMLA discrimination/retaliation claim." (Def.'s Reply at 1). Defendant cites *Atchison v. Sears*, 666 F. Supp. 2d 477, 489 (E.D. Pa. 2009), in which the court

found that the plaintiff's interference claim was identical to his retaliation claim. The *Atchison* court declined to analyze the interference claim, stating the plaintiff "cannot escape the [FMLA retaliation] McDonnell Douglas analysis to prove his case merely by affixing an 'interference' label to one of his duplicative claims." *Id.*

The parties' arguments are well taken. Assuming the first four factors of Plaintiff's *prima facie* case are met, the only dispute is whether Defendant denied Plaintiff benefits to which she was entitled. Case law from the Sixth Circuit and other courts reflects inconsistent holdings on whether a plaintiff is denied benefits where she was terminated after returning from FMLA leave. *Wysong*, 503 F.3d at 447 (adverse employment action based on FMLA leave is an interference); *Bradley*, 322 F. Supp. 2d at 940 (holding the same); *Atchison*, 666 F. Supp. 2d at 489 (adverse employment action after FMLA leave is not a denial of benefits and should be analyzed as an FMLA retaliation claim); *Morris v. Family Dollar Stores of Ohio, Inc.*, 320 Fed. App'x 300, 335 (6th Cir. 2009) (FMLA interference claim is not waived where complaint raised arguments that could apply to both interference and retaliation).

The Court finds *Seeger*, 681 F.3d at 282, instructive for purposes of resolving the present dispute. In *Seeger*, the Sixth Circuit acknowledged that a plaintiff does not generally waive an interference claim where he asserts "general violations of 29 U.S.C. § 2615 that could apply to both interference and retaliation claims." *Id.* (citing Morris, 320 Fed. App'x at 335). However, the *Seeger* court went on to explain "the essence of Seeger's claim is retaliation, not interference with his substantive FMLA rights." *Id.* Because the plaintiff received all the FMLA leave to which he was entitled, his FMLA leave request was approved, he was reinstated to his former position upon returning, and he was not shortchanged leave time, the court found that the district court did not err in analyzing his claim under solely the retaliation theory. *Id.* at 283.

This case presents similar facts. Plaintiff was never denied FMLA leave. In fact, Plaintiff testified that there were months where she took more FMLA leave than was certified by her physician. (Pl.'s Depo. 79:20–80:13). According to her testimony, Defendant did not discipline her for taking more FMLA leave than was approved. (*Id.*). Instead, Defendant simply asked Plaintiff to get her certification form amended. (*Id.*). Nor did Defendant refuse to reinstate Plaintiff to her original position upon her return. Accordingly, the essence of Plaintiff's argument is that Defendant retaliated against her for taking FMLA leave—not that Defendant interfered with her right to take FMLA leave.

Finding no cognizable difference between Plaintiff's FMLA retaliation and interference claims, the Court **GRANTS** Defendant's Motion for Summary Judgment with respect to its interference claim.

## C. Retaliation Under the ADA and Ohio Law

Plaintiff also asserts retaliation claims under the ADA and Ohio law. The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a change, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. §12203(a). "The ADA is not, however, a catchall statute creating a cause of action for any workplace retaliation, but protects individuals only from retaliation for engaging in, or aiding another who engages in, activity covered by the ADA." *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014).

In the absence of direct evidence of retaliation, an ADA retaliation claim is analyzed using the *McDonnell-Douglas* burden-shifting framework. *Id.* (citing *A.C. v. Shelby County Board of Education*, 711 F.3d 687, 697 (6th Cir. 2013)). The plaintiff bears the initial burden of

establishing a *prima facie* case of retaliation, which requires a showing that: "(1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." *Id.* If the plaintiff meets this burden, the defendant must then articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* (citing *Penny v. UPS*, 128 F.3d 408, 417 (6th Cir. 1997)). The burden then shifts back to the plaintiff to show that the proffered reason for the action was "merely pretext." *Id.*

As to the engagement in protected activity, Plaintiff contends that requesting and taking FMLA leave amounts to protected activity under the ADA. (Pl.'s Opp'n at 26). Plaintiff relies on *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 783 (6th Cir. 1998), in which the Sixth Circuit found that "a medical leave of absence can constitute a reasonable accommodation under appropriate circumstances." In *Cehrs*, the Court determined the plaintiff's medical leave was protected as a reasonable accommodation under the ADA because: (1) the defendant routinely granted medical leave to employees, and (2) an issue of fact existed as to whether granting leave to the plaintiff unduly burdened the defendant. *Id.* Here, Plaintiff routinely took FMLA leave for her medical conditions and Defendant raises no facts to suggest it was unduly burdened by Plaintiff's absence. Accordingly, Plaintiff satisfies the first element of her retaliation claim. Moreover, the second and third elements are met because Defendant knew of Plaintiff's disabilities and Plaintiff's termination was an adverse employment action.

To meet the fourth prong of a *prima facie* case (i.e., a causal connection between the protected activity and the adverse action), Plaintiff "must produce sufficient evidence to establish that [she] only suffered adverse employment action because of the" protected activity. *Harris v.*

*State of Ohio, Dept. of Mental Health*, 2:01-CV-725, 2002 WL 31951262, at *7 (S.D. Ohio Nov. 21, 2002) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559 (6th Cir. 2000)). "That is, Plaintiff must establish that nothing he did, such as poor performance or attitude, precipitated the adverse employment action." *Id.* (citing *Samadi v. State of Ohio, Bureau of Employment Services*, No. C2-99-563, 2001 WL 175265 at *8 (S.D. Ohio Feb. 13, 2001)).

Temporal proximity between the protected activity and the adverse employment action is sometimes, but not always, sufficient to demonstrate causation. In *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525–526 (6th Cir. 2008), the Sixth Circuit "found that temporal proximity demonstrated causation when the employer fired the employee the same day that the employer learned of the employee's EEOC charge." In other words, "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation." *Goree v. United Parcel Serv., Inc.*, 17-5139, 2017 WL 5664924, at *4 (6th Cir. Nov. 8, 2017) (citing *Mickey*, 516 F.3d at 525).

"But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* (citing *Little v. BP Expl. & Oil Co.*, 265 F.3d 357, 365 (6th Cir. 2001)). Thus, "unless immediate, temporal proximity must be 'coupled with other indicia of retaliatory conduct' to give rise to a causal inference." *McCoy v. Mv Residential Prop. Mgt., Inc.*, 2:14-CV-2642, 2016 WL 1392483, at *7 (S.D. Ohio Apr. 8, 2016) (citing *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588–89, 595 (6th Cir. 2009)).

In the instant action, Defendant learned of Plaintiff's FMLA leave approximately nine days before terminating her. Plaintiff testified that after leaving work to seek medical treatment

40

on June 5, 2017, she "promptly communicated that [she would] be out on FMLA leave." (Pl.'s Aff. ¶ 29). Defendant did not terminate Plaintiff until June 14, 2017. (Pl.'s Aff. ¶¶ 45–53). Thus, Plaintiff must present indicia of other retaliatory conduct in order to establish a causal connection between her FMLA leave and her termination.

Plaintiff presents numerous facts which suggest that Defendant possessed a discriminatory or retaliatory animus, including: (1) Manager Foisset's allegedly discriminatory comment, (2) abrupt changes to Plaintiff's FMLA paperwork requirements, (3) negative comments on Plaintiff's performance evaluation for taking FMLA leave, and (4) the potential disparate treatment between Plaintiff and similarly-situated employees. Consequently, Plaintiff raises a genuine dispute of material fact as to whether she can set forth a *prima facie* case for retaliation. Next, the *McDonnell-Douglas* burden shifts to Defendant to provide a nondiscriminatory explanation for its conduct. As noted *supra*, Defendant's proffered nondiscriminatory reasons for its adverse action (i.e., violation of company policy and dishonesty) are sufficient to meet its burden. Finally, for the reasons previously discussed, Plaintiff can raise a genuine dispute of material fact as to whether Defendant's nondiscriminatory reasons were pretextual.

Accordingly, the Court **DENIES** Defendant's Motion for Summary Judgment on Plaintiff's ADA and Ohio retaliation claims.

## D. Failure to Accommodate Under the ADA and Ohio Law

Next, Plaintiff asserts failure to accommodate claims under the ADA and Ohio law. "Discrimination under the ADA includes both: (1) taking an adverse action 'against [a qualified individual] on the basis of disability' and (2) failing to make reasonable accommodations for the known limitations of an employee with a disability." *Johnson v. JPMorgan Chase & Co.*, 922 F.

Supp. 2d 658, 666 (S.D. Ohio 2013) (quoting 42 U.S.C. §§ 12112(a), 12112(b)(5)(A)). To prove a *prima facie* case for failure to accommodate, Plaintiff must demonstrate: (1) she is disabled, (2) she is otherwise qualified for the position, with or without reasonable accommodation, (3) her employer knew or had reason to know of her disability, (4) she requested an accommodation, and (5) the employer failed to provide the necessary accommodation. *Johnson v. Cleveland City School Dist.*, 443 Fed. App'x 974, 982–983 (6th Cir. 2011).

Under the *McDonnell-Douglas* burden-shifting framework, "[a] disabled employee who claims that he or she is otherwise qualified with a reasonable accommodation 'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.'" *Hedrick v. W. Reserve Care System*, 355 F.3d 444, 2004 U.S. App. LEXIS 231, 2004 FED App. 0012P (6th Cir.), 93 Fair Empl. Prac. Cas. (BNA) 167, 84 Empl. Prac. Dec. (CCH) P41,562, 15 Am. Disabilities Cas. (BNA) (quoting *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633-34 (6th Cir. 1998)). "An employer, then, has the burden of persuasion to show that an accommodation would impose an undue hardship." *Id.* (citing *Cassiday*, 138 F.3d at 634).

Plaintiff avers that she requested reasonable accommodations, "yet Defendant failed to provide her with these accommodations in violation of the ADA." (Pl.'s Opp'n at 27). Specifically, Plaintiff contends her medications necessitate frequent and urgent use of the restroom—"making it nearly impossible to be tethered to her desk for an entire phone rotation." (*Id.*). According to Plaintiff, Defendant failed to provide her with a reasonable accommodation, such as removing her from the rotation, shortening her shift, or giving her the ability to take breaks during her shift. (*Id.*). As a result, Plaintiff testified: "[b]eing on the phones at that time, I would need to use the restroom. And there was a time where I had to use the restroom, but

because I was told we had to use it before or after, I had literally peed myself at my desk." (Pl.'s Depo. 67:1–13). Plaintiff also asserts that Defendant failed to accommodate her requests regarding perfume smells and cold air vents. (*Id.* at 66:11–24).

Defendant argues that Plaintiff's accommodation claims lack merit because she "continuously" received accommodations from management. (Def.'s Mot. for Summ. J. at 11). In addition, Defendant states that Plaintiff's accommodation claims are time-barred because she did not file a charge with the EEOC within 180 days from when the alleged discrimination took place. (*Id.* at 16) (citing *Gainor v. Worthington City Schools.*, 2013 U.S. Dist. LEXIS 176031, at *13 (S.D. Ohio Dec. 13, 2013). Although Plaintiff did not file her EEOC Charge until July 24, 2017, she asked for perfume accommodations as early as March 25, 2015 (Exhibit F), air vent accommodations in April 2012 (Exhibit G), and phone rotation accommodations by August 5, 2015 (Exhibit H).

Furthermore, Defendant points out that this Court previously held that ADA claims are subject to a two-year statute of limitations. *McCormick v. Miami University*, 2011 U.S. Dist. LEXIS 48467, at *45 (S.D. Ohio May 5, 2011). Defendant cites *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984), where the Sixth Circuit stated "[t]he statute of limitations commences to run when the plaintiff knows or has reason to know of the injury which is the basis of his action." In this case, Defendant argues that Plaintiff knew or had reason to know of its alleged failure to accommodate her requests as early as 2012. (Def.'s Mot. for Summ. J. at 16). Defendant accurately states that Plaintiff did not file her Complaint until September 15, 2017—nearly five years after she made her first accommodation request. (*Id.*).

The Court need not address Defendant's statute of limitation arguments because, even assuming Plaintiff acted timely, she cannot establish a *prima facie* case for failure to

accommodate. Turning to the requisite elements of a failure to accommodate claim, Plaintiff can easily satisfy the first four. The parties do not dispute that Plaintiff is disabled. Nor do the parties argue over whether Plaintiff is otherwise qualified to be a billing manager. As Plaintiff notes, she has at least 23 years of experience in the medical billing industry and received largely positive performance review scores while employed with Defendant. (Pl.'s Opp'n at 27). Defendant knew of Plaintiff's disability, and Plaintiff clearly requested accommodations numerous times.

However, Plaintiff cannot show that Defendant failed to provide reasonable accommodations. In *Kleiber v. Honda of America Manufacturing*, 420 F. Supp. 2d 809, 826 (S.D. Ohio 2006), this Court held that, while employers should act in good faith when seeking employee accommodations, they are not required to provide accommodation where doing so would impose an undue burden. "Employers can show their good faith by taking steps such as meeting with the employee who requests the accommodation, requesting information about the condition and the employee's limitations, asking the employee what he wants, showing some sign of having considered the employee's request, and offering to discuss available alternatives when the employee's request is too burdensome." (*Id.*). Under the Code of Federal Regulation, employers must engage in this informal, interactive process with the requesting employee in order to provide reasonable accommodation. 29 C.F.R. § 1630.2(o)(3). The Court will address Plaintiff's three accommodation requests in turn.

### 1. Plaintiff's Perfume Accommodation

Defendant fully accommodated Plaintiff requests concerning irritating perfume smells. At Plaintiff's first request, Defendant sent out several emails asking staff members not to spray perfumes in common areas. (Pl.'s Depo. 77:1–12; 81:1–4; Def.'s Exhibit F). Although Plaintiff

asserts that the smells returned after a short period of time, there is no evidence in the record indicating that she ever requested further accommodation. (Pl.'s Depo. 77:1–8). According to the Sixth Circuit, a plaintiff may not rely on accommodations that she did not request. *Virts v. Consolidated Freightways Corp. of Delaware*, 285 F.3d 508, 518 (6th Cir. 2002). As such, Plaintiff cannot meet the fifth element of a *prima facie* case with respect to the perfumes.

## 2. Plaintiff's Air Vent Accommodation

Plaintiff's contention that Defendant failed to make adequate accommodation regarding the air vents is not well taken. After Plaintiff notified Manager Pohlman about a cold air vent above her desk in 2012, Defendant took numerous steps to resolve the issue. (*See* Def.'s Exhibit G). Initially, Defendant tried to adjust the thermostat. (Pl.'s Depo. 76:1–3). When the adjustment failed, Defendant sent a maintenance worker to attempt to fix the thermostat on two separate occasions. (*Id.* at 76:9–20). Finally, Defendant asked the maintenance worker to attach a lockbox to the thermostat to prevent employees from changing the temperature. (*Id.*). Only after attempting these methods did Defendant decline to purchase an expensive part to deflect the air flow. (*Id.*). In addition, Defendant offered to move Plaintiff's desk away from the air vent as early as 2012. (Def.'s Exhibit G). Alternatively, Defendant suggested that Plaintiff could use a piece of plastic to block the air flow. (Pl.'s Depo. 76:9–14).

As accurately noted by Defendant, proposed accommodations must be "efficacious and of proportional to costs." *Monette*, 90 F.3d at 1183. In other words, an "employer need not provide the accommodation that the employee requests or prefers. Instead, the employer retains the 'ultimate discretion' to choose another effective accommodation . . . Accordingly, an employee is not entitled to a particular reasonable accommodation if another reasonable

45

accommodation is provided." *Trepka v. Board of Education*, 28 Fed. App'x 455, 459–460 (6th Cir. 2002).

Here, Defendant provided Plaintiff with numerous reasonable accommodations regarding the air vent. Just because Plaintiff wanted Defendant to buy a mechanical part to deflect the air vent does not mean Defendant was obligated to choose that specific accommodation. Moreover, Defendant engaged in a constructive dialogue about Plaintiff's request over a period of several years. This interactive process reflects Defendant's good faith attempt to accommodate Plaintiff. Therefore, Plaintiff cannot establish the fifth element of her *prima facie* case with respect to air vent accommodations.

### 3. Plaintiff's Phone Rotation Accommodation

Plaintiff's phone rotation accommodation request requires more detailed analysis. According to Plaintiff, Manager Pohlman explicitly denied her request to take restroom breaks during her phone rotation. (Pl.'s Opp'n at 27). However, Plaintiff's exact testimony was as follows:

> [Manager Pohlman] had told us we were not allowed to use the restroom during the phone time. And she had stated that in one of our meetings. And she told us we had to be on the phone during that time. Somebody said, what about the restrooms? And she said, go before or after.

(Pls.' Depo. 66:11–67:13). The parties do not dispute that this conversation occurred during an employee meeting and did not pertain to Plaintiff's situation specifically. Moreover, undisputed evidence suggests that Manager Pohlman did accommodate Plaintiff by permitting her to have another employee cover the phones during her breaks. Plaintiff testified:

> A. I don't recall -- I don't know if I went to her at that time or shortly after that. But I did let her know about the medicine I was on.
>
> Q. You let her know, hey, I'm on medicine and I'm going to have a difficult time not going?

46

A. Yes.

Q. What did she say?

A. What she had said was to get another employee to take over the phone while I go. . .

Q. Okay. You go to Amber and she says, fine, I understand, get somebody to cover before you go?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. And did you tell her then, I don't think that will work for me. Because of the way it works for me, I need to go immediately?

A. I didn't say it that way. I just explained to her about the bouts of diarrhea that—you don't know when that's going to come on. And I don't know when I'm going to have specifically to use the restroom.

Q. What did she say to you then?

A. Do the best you can.

(Pl.'s Depo. 70:19–72:1).

Regardless of whether seeking coverage from another employee was Plaintiff's preferred accommodation, the Court determines it was *a* reasonable accommodation. *See Trepka*, 28 Fed. App'x at 459–460. Asking a fellow employee to cover the phones for a 15-minute period, even abruptly, is not a difficult or prolonged task. If Plaintiff was concerned about finding last-minute coverage, she could have asked a coworker to automatically watch the phones any time she left her desk during a rotation. In addition, email records from August 2015 and January 2017 show that Defendant permitted Plaintiff to be taken off phone duty several times to accommodate her disability. (Def.'s Exhibit H). In the August 5, 2015 email, Supervisor Nyinaku wrote: "Benita

has an excuse from her doctor to be off phones from 8/4/15 to 8/7/15." (*Id.*). And when Plaintiff asked to be taken off the phones on January 10, 2017 because she was "in a lot of pain," Manager Pohlman responded: "Sure are you ok?" (*Id.*).

The only request that Defendant refused to accommodate was Plaintiff's petition to be completely removed from the phone rotation. (Pl.'s Depo. 73:10–14). While Plaintiff asserts this refusal constitutes a failure to accommodate under the ADA, the Court is unconvinced. An individual is not "otherwise qualified" for a position if they cannot perform the essential functions of the job with reasonable accommodation. *Johnson*, 443 Fed. App'x at 985. In determining whether a task is an essential function of a job, "consideration shall be given to the employer's judgment as to what functions of a job are essential." *Id.* (citing U.S.C. § 12111(8); *Denczak v. Ford Motor Co.*, 215 Fed. App'x 442, 444 (6th Cir. 2007)). *See also EEOC v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (holding that "regular and predictable on-site job attendance" is an essential function of a resale buyer); *Johnson*, 443 Fed. App'x at 978 ("Maintaining order and discipline in the classroom is, of course, an essential function of the job of [a] classroom teacher").

Pursuant to this rule, an employer's duty of reasonable accommodation does not require "creating a new job, moving another employee, promoting the disabled employee, or violating another employee's rights under a collective bargaining agreement." *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998). Although restructuring a job can be a reasonable accommodation, this only applies to restructuring non-essential duties. *Bratten v. SSI Services., Inc.*, 185 F.3d 625, 632 (6th Cir. 1999). The Sixth Circuit reiterated this position in *EEOC*, holding it is *per se* unreasonable to accommodate an employee by removing an essential function of his or her job. *EEOC*, 782 F.3d at 761.

Plaintiff admits that answering phone calls was an essential function of her job. Defendant listed "[a]nswer incoming phone calls in a timely and courteous manner, resolve callers' inquiries" as primary job functions of Billing Representatives in its Job Description form. (Def.'s Exhibit A). Plaintiff does not contest this fact, instead testifying:

> Q. Certainly if they had taken you off the phones, that would have modified one of the core duties of your job; correct?
>
> A. As far as—
>
> Q. Answering the phones was one of the job duties that you did every day?
>
> A. That was part of it, yes.
>
> Q. Answering the phones was one of the duties that everyone in your job classification did every day?
>
> A. Yes. But they wanted me to spend more time on collections.

(Pl.'s Depo. 74:21–75:8).

Consequently, Plaintiff failed to show that her proposed accommodation—being permanently removed from the phone rotation—was reasonable. Because Defendant reasonably accommodated Plaintiff's other requests, Defendant is entitled to judgment as a matter of law. The Court **GRANTS** Defendant's Motion for Summary Judgment on Plaintiff's failure to accommodate claims.

## IV.

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion for Summary Judgment (ECF No. 12) in accordance with this Opinion and Order.

**IT IS SO ORDERED.**

2-27-2019
_____
DATE

_____
EDMUND A. SARGUS, JR.
CHIEF UNITED STATES DISTRICT JUDGE